# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

KATHLEEN THRASHER,

        Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner, Social Security
Administration,

        Defendant.

Case No. 3:13-cv-00166-SLG

## DECISION AND ORDER

Kathleen Thrasher initiated this Social Security appeal in federal district court after exhausting administrative remedies. The appeal has been fully briefed by the parties,[1] and oral argument was held on February 27, 2014 in Anchorage, Alaska.[2] For the reasons set forth below, the Commissioner's determination will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Thrasher is 45 years old.[3] She has completed at least four years of college studying psychology and human services, but she does not have a college degree.[4] In

---

[1] Docket 16 (Thrasher Br.); Docket 17 (Comm'r Br.); Docket 18 (Reply).

[2] Docket 23 (Minute Entry). Ms. Thrasher also filed a Notice of Supplemental Authority at Docket 21, which compares ALJ Paul Hebda's treatment of GAF scores in a different case, *Kasukonis v. Colvin*, 3:13-cv-228-RRB, to his treatment of GAF scores in this case. The Commissioner moved to strike the notice at Docket 22, and Ms. Thrasher opposed at Docket 24. No reply was filed. *Cf.* D.Ak. LR 7.1(b) ("A reply memorandum by the party initiating a motion is optional . . . ."). Because the Notice of Supplemental Authority does not provide authority relevant to this appeal and does not comply with Local Civil Rule 7.1(i)(1)(B), the motion to strike will be granted. *See* D.Ak. LR 7.1.(i)(1)(B) (explaining notice of supplemental authority must set forth page number(s) of brief to which supplemental authority pertains and may not contain additional arguments); *Mathews v. Weber*, 423 U.S. 261, 263 (1976) (in social security appeal, reviewing court "may consider only the pleadings and administrative record").

[3] *See* Docket 14 (Administrative Record [hereinafter A.R.]) 166.

1994, she worked for no more than one week as a sheet folder in a hotel.[5] From 1994 to 1997, she worked as a cashier and waitress.[6] In 1998 and 1999, she worked as a social service aide at Arc of Anchorage.[7] In 2000, she worked for one week as a sales clerk at Walmart, and then in 2004 she worked for a couple months as a folding machine feeder in a print shop.[8] Most recently, from November 2005 to March 2006, she worked as a counter attendant at a coffee shop.[9]

The record reflects that Ms. Thrasher was abused by her father as a child and has been a victim in abusive relationships as an adult. She has a long history of substance abuse and suffers from depression and other mental impairments.[10]

## I. Ms. Thrasher's Application for Supplemental Security Income.

Ms. Thrasher filed the current application for Supplemental Security Income ("SSI") with the State of Alaska Disability Determination Services ("DDS") with a protective filing date of January 20, 2011.[11] She alleged a disability onset date of

---

[4] A.R. 74–75, 200. Ms. Thrasher last attended college in 2005. A.R. 200.

[5] A.R. 76, 187.

[6] A.R. 76, 187.

[7] A.R. 76.

[8] A.R. 75, 187.

[9] A.R. 75, 187.

[10] *See, e.g.*, A.R. 356–58 (2/3/09 Providence Crisis Recovery Center clinical intake assessment); A.R. 476–78 (9/23/10 psychiatric evaluation).

[11] *See* A.R. 184. When Ms. Thrasher filed her application, a DDS employee made the following observation: "Claimant relied heavily on her caseworker to help her remember dates of treatment and medical providers. Claimant is a poor historian." But the DDS employee also observed that Ms. Thrasher had no difficulty with such tasks as understanding, coherency, concentrating, talking, and answering. A.R. 185.

January 24, 2008.[12] She listed depression, post-traumatic stress disorder ("PTSD"), and anxiety disorder as the conditions that limit her ability to work.[13]

On March 17, 2011, DDS denied Ms. Thrasher's application for SSI.[14] Thereafter, Ms. Thrasher requested a hearing before an administrative law judge ("ALJ"), which the Social Security Administration ("SSA") acknowledged receiving in a letter dated July 12, 2011.[15] Ms. Thrasher's hearing was set for November 29, 2011.[16] On November 28, 2011, Ms. Thrasher called SSA and requested a postponement.[17] She stated she was "still seeking representation." The SSA representative "asked her to attend her hearing and let the Judge know she is wishing to obtain representation."[18]

Ms. Thrasher appeared at the hearing the next day before ALJ Paul Hebda and requested a postponement.[19] She testified, "I really need to, to have an attorney,

---

[12] A.R. 166. Ms. Thrasher previously filed at least one other set of applications for disability insurance benefits ("DIB") and SSI on April 25, 2006. A.R. 88. These applications were denied by DDS on June 23, 2006. Thereafter, Ms. Thrasher requested a hearing. She failed to appear at the hearing, and ALJ John Bauer dismissed the request for a hearing on those applications on January 25, 2008—the day after Ms. Thrasher's alleged onset date in the SSI application in this case. *See* A.R. 88–89. Ms. Thrasher may also have filed other applications after 2006. *See* Docket 16 at 14 (Thrasher Br.).

[13] A.R. 199.

[14] A.R. 100.

[15] A.R. 107; *see also* A.R. 106 (6/1/11 statement of good cause by Ms. Thrasher for untimely filing of request for hearing).

[16] A.R. 131.

[17] A.R. 144.

[18] A.R. 144.

[19] A.R. 26–27.

because I'm really not prepared."[20]   The ALJ agreed to give Ms. Thrasher one postponement,[21] and the hearing was rescheduled.[22]   Ms. Thrasher subsequently obtained representation,[23] and the hearing took place on March 13, 2012 in Anchorage, Alaska before ALJ Hebda.[24]

## II.   The Administrative Record.

The administrative record before the ALJ reflects the following:

### A.  Ms. Thrasher's Mental Health Treatment Records.

Ms. Thrasher has been seeing mental health specialists since childhood.[25]  In the years relevant to her SSI application, Ms. Thrasher has sought mental health treatment from Anchorage Community Mental Health Services ("ACMHS").[26]   It appears she first visited ACMHS sometime in late 2005 or early 2006 following a drug overdose.[27]   She then began medication management and psychotherapy at ACMHS.[28]  From November

---

[20] A.R. 28.

[21] A.R. 30; *see also* A.R. 146 (Acknowledgment of Postponement).

[22] A.R. 147.

[23] A.R. 159.

[24] *See* A.R. 33–85.

[25] A.R. 216, 246.

[26] *See* A.R. 257–324, 390–403, 476–89, 497–509.

[27] *See* A.R. 319.

[28] A.R. 319.  The record reflects that Ms. Thrasher attended many counseling and therapy sessions at ACMHS over the years.  *See, e.g.*, A.R. 315 (8/27/08 Medical Progress Note Entry) ("[Ms. Thrasher] agrees to schedule an appointment with Carolyn E. Phillips, her therapist, before leaving today."); A.R. 393 (3/19/09 Medical Progress Note Entry) ("[Ms. Thrasher] will continue working with Carolyn Phillips for therapy . . . .").  However, only the visits to psychiatrists for medication management are included in the record.

16, 2006 to August 2, 2007, Ms. Thrasher consulted with Christina Haskell, MS, on several occasions about medications.[29]   On August 15, 2007, she began seeing Dr. Janet Dipreta.[30]

Sometime in late 2007, Ms. Thrasher enrolled in a court-ordered, long-term inpatient alcohol treatment program at the Akeela House after receiving a second DUI.[31] On January 25, 2008—the day after Ms. Thrasher's alleged onset date—Dr. Dipreta conducted a psychiatric evaluation of Ms. Thrasher.[32]   Dr. Dipreta diagnosed Ms. Thrasher with major depressive disorder, recurrent and severe but without psychotic features; chronic PTSD; alcohol dependence in early remission in a controlled setting; and polysubstance dependence, including cocaine and amphetamines, in sustained remission.[33]   Dr. Dipreta assessed a Global Assessment of Functioning ("GAF") score of 35.[34]   Dr. Dipreta recommended that Ms. Thrasher continue taking Effexor, noting Ms. Thrasher's depression "has responded very well to this."[35]   She also recommended

---

[29] See A.R. 280–300.

[30] A.R. 301.

[31] See A.R. 306.  Before this, Ms. Thrasher had been living with her mother and stepfather. A.R. 321.

[32] A.R. 319.

[33] A.R. 323.

[34] A.R. 323.  "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment."  *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (citing *Diagnostic and Statistical Manual of Mental Disorders* 20 (3rd. ed, rev. 1987)).  A GAF score of 35 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  A.R. 496.

[35] A.R. 323.

Ms. Thrasher continue taking Topomax, as well as trazodone and propranolol for insomnia and anxiety, respectively.[36] Finally, she recommended that Ms. Thrasher continue psychotherapy.[37]

Ms. Thrasher met with Dr. Dipreta again on February 22, 2008.[38] At this visit, Ms. Thrasher reported she was "doing great" and had "become one of the group leaders" at the Akeela House.[39] Dr. Dipreta's notes indicate that Ms. Thrasher's "mood symptoms have been stable on medications."[40]

After the February 2008 visit, Ms. Thrasher continued to see Dr. Dipreta approximately once every two months. In April 2008, Ms. Thrasher reported she had been "demoted as group leader" because a fellow group leader misbehaved, but she also indicated the Akeela House program was therapeutic.[41] Additionally, at that visit, as well as on visits in June and August 2008, Ms. Thrasher reported that her medications—particularly Effexor and Topomax—were generally effective in controlling the symptoms of her depression.[42] Nonetheless, at the August 2008 visit, Ms. Thrasher

---

[36] A.R. 323–24.

[37] A.R. 320, 324.

[38] A.R. 308.

[39] A.R. 308.

[40] A.R. 309.

[41] A.R. 310.

[42] *See* A.R. 310 (4/25/08 Medical Progress Note Entry) ("[Ms. Thrasher] feels that the meds are working, but she is reporting some increase in depressed feelings premenstrually."); A.R. 312 (6/27/08 Medical Progress Note Entry) ("[Ms. Thrasher] states that she has been doing very well on the current medications, which are [t]he Effexor . . . and Topomax . . . . She feels that she has been fairly even, although she readily acknowledges that there is difficulty in moodiness due to the intensity of the inpatient experience."); A.R. 314 (8/27/08 Medical Progress Note

expressed a desire "not to be dependent on medications, even though they are working and basically without side effects."[43]

Ms. Thrasher met with Dr. Dipreta again in October 2008, and at this visit she reported, "I'm not doing so good anymore, I have been drinking."[44]  She also reported that she had recently been asked to leave the Akeela House because of her drinking.[45] Dr. Dipreta's notes state, "[Ms. Thrasher] understands that benefits of meds are limited in the face of ongoing alcohol use and it is particularly concerning[] that she is taking meds and not committing to sobriety."[46]  Her notes also state, "[Ms. Thrasher] recognizes that she does need to work and believes that she is able to do so but has not yet looked for employment."[47]

On January 22, 2009, Ms. Thrasher sought treatment at the emergency room at Providence Alaska Medical Center ("PAMC") for injuries she sustained as a result of being punched multiple times in the face, nose, and side of her head by a male

---

Entry) ("I am doing great on the meds.").  Shortly before her June 2008 visit with Dr. Dipreta, Ms. Thrasher visited the emergency room at Providence Alaska Medical Center ("PAMC") because she ran out of Effexor and was experiencing withdrawal symptoms.  A.R. 329–30. PAMC prescribed two doses of Effexor and directed Ms. Thrasher to follow up with ACMHS. A.R. 330.

[43] A.R. 314.

[44] A.R. 316.  Approximately one month prior to this visit, on September 15, 2008, Ms. Thrasher visited the PAMC emergency room.  A.R. 327.  PAMC's notes state: "The patient had been sober for quite some time and then she started drinking again."  A.R. 327.  PAMC diagnosed Ms. Thrasher with alcohol intoxication but cleared her to return to the Akeela House.  A.R. 328.

[45] A.R. 316.

[46] A.R. 317.

[47] A.R. 316.

companion.[48]  Around the same time, Ms. Thrasher's therapist referred her to the Providence Crisis Recovery Center ("PCRC"), where she was evaluated for "an inability to stop using drugs and drinking, deepening depression and very recent history of trauma that has become increasingly bothersome to her."[49]  PCRC initially assessed a GAF score of 35.[50]

Ms. Thrasher stayed at PCRC for one week.[51]  PCRC's February 10, 2009 discharge summary states that during the course of Ms. Thrasher's stay, she "attended all groups and interacted appropriately with peers and staff."[52]  She also "respond[ed] to education on how to manage her strong feelings more effectively" and "was willing and able to demonstrate effective use of coping and containment skills."  And her "ability to sleep improved and her mood stability became more consistent."[53]  The discharge summary notes that Ms. Thrasher had "expressed a willingness to work with [ACMHS] and VocRehab towards obtaining permanent independent housing and possible

---

[48] A.R. 451–53.

[49] A.R. 356.  The PCRC clinical intake assessment indicates that Ms. Thrasher's drinking, drug use, and depression had all worsened considerably following her discharge from the Akeela House.  A.R. 356.

[50] A.R. 358.

[51] A.R. 360.

[52] A.R. 361.

[53] A.R. 361.

employment opportunities."[54]   PCRC assessed a GAF score of 50 at the time of discharge.[55]

Ms. Thrasher again met with Dr. Dipreta at ACMHS on March 19, 2009.[56]  At this visit, Ms. Thrasher reported that she had been sober since March 11, 2009, that she had checked into a shelter, and that she was hoping to get into treatment at Clitheroe.[57] The following day, Dr. Dipreta performed a psychiatric evaluation update on Ms. Thrasher.[58]  Dr. Dipreta's assessment states:

> [Ms. Thrasher's] mood symptoms and anxiety symptoms have responded well to the current medications [and] to regular therapy.  She readily acknowledges when she maintains sobriety and is compliant with medications that she does fairly well.  Nevertheless, she has struggled with ambivalence about maintaining sobriety as has been marked by ongoing indecisiveness about her commitment to inpatient substance abuse treatment.[59]

Dr. Dipreta assessed a GAF score of 50.[60]  Among other things, she recommended Ms. Thrasher continue on her medications and with individual therapy.[61]

---

[54] A.R. 362.

[55] A.R. 360.  A GAF score of 50 indicates "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning."  A.R. 496.

[56] A.R. 392.

[57] A.R. 392; *see also* A.R. 181 (stating Ms. Thrasher stayed at Abused Women's Aid in Crisis shelter from March 11, 2009 to April 7, 2009).

[58] A.R. 396.

[59] A.R. 399.  At this time Ms. Thrasher was taking Effexor for depression, Topomax for anxiety, and doxepin at night for sleep.  A.R. 396.

[60] A.R. 400.

[61] A.R. 400.

Ms. Thrasher met with Dr. Dipreta again on June 25, 2009 and reported "doing better."[62]  Ms. Thrasher next saw Dr. Dipreta on November 5, 2009.  Then, she told Dr. Dipreta that she had found an apartment.[63]  She also reported that "she was doing quite good on medication, but that she ran out and decided she might as well try to stop medication."  When symptoms returned, she went back on Effexor.  She acknowledged that she should not have tried to stop taking her medications and "express[ed] a renewed willingness . . . to be fully adherent with medications and appointments."[64]

On February 6, 2010, Ms. Thrasher once again sought treatment at the PAMC emergency room for injuries she sustained as a result of being kicked in the face by "her boyfriend."[65]  The following day, Ms. Thrasher was brought back to the emergency room after calling the paramedics and stating that she and another friend had "made a 'suicide pact' and had taken a large amount of sedatives."[66]  On February 8, 2010, Dr. Anthony Blanford consulted with Ms. Thrasher at PAMC.[67]  His notes state:

> [Ms. Thrasher] states she overdosed on about 60 doxepin but almost immediately panicked and had her friend call for help.  There was almost no real "pact."  In fact, she and her friend seemed to be **parting** and doing okay and then started to feel poorly.  Then suddenly both decided that they wanted to kill themselves.[68]

---

[62] A.R. 394.

[63] A.R. 390.

[64] A.R. 390.

[65] A.R. 441.

[66] A.R. 404.

[67] A.R. 407.

[68] A.R. 407 (emphasis added); *see also infra* Discussion Part II.A, D (discussing "parting").

Dr. Blanford assessed a GAF score of 30 and recommended that Ms. Thrasher be hospitalized on a voluntary basis, to which she agreed.[69]   On February 10, 2012, Dr. Blanford increased the dosage of Ms. Thrasher's Effexor.[70]   Two days later, Ms. Thrasher was discharged from PAMC with instructions to follow up with Dr. Dipreta.[71] At the time of discharge, she was assessed a GAF score of 45.[72]

Ms. Thrasher met with Dr. Dipreta on February 25, 2010 and reported feeling depressed.[73]   She told Dr. Dipreta "that the Effexor is no longer working as well as she remembers it working previously."[74]   Dr. Dipreta switched Ms. Thrasher from Effexor to Pristiq.[75]

Three and a half months later, on June 11, 2010, Ms. Thrasher met with Dr. Marvin Weninger at ACMHS.[76]   She reported feeling depressed and noted that she was staying in bed and eating more.[77]   She also indicated she was "umemployed[] but . . .

---

[69] A.R. 409.  A GAF score of 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations," "serious impairment[] in communication or judgment," or "inability to function in almost all areas."  A.R. 496.

[70] A.R. 418.

[71] A.R. 411–12.

[72] A.R. 411.  A GAF score of 45 indicates "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning."  A.R. 496.

[73] A.R. 488.

[74] A.R. 488.

[75] A.R. 489.

[76] A.R. 486–87.

[77] A.R. 486.

looking for work as a cashier."[78]   Dr. Weninger increased Ms. Thrasher's dosage of Pristiq.[79]   Ms. Thrasher met with Dr. Weninger again on June 24, 2010 and reported "her mood is better."[80]   Dr. Weninger's notes from that visit state: "I think this woman is making a good start to recovery from depression."[81]

On September 23, 2010, Ms. Thrasher had what appears to be her first visit with Dr. Rachad Rayess at ACMHS.[82]   According to Dr. Rayess's notes, Ms. Thrasher's chief complaint was, "I am running out of medications and I would like to know if you want to change any of the medications."[83]   Ms. Thrasher also reported feeling "anxious and hypervigilant."   Dr. Rayess interviewed Ms. Thrasher and reviewed her records.[84] He assessed a GAF score at that time of 50.[85]   He discontinued Ms. Thrasher's Topomax, started her on Prozac and Ativan, and kept her on Pristiq.[86]

Ms. Thrasher met with Dr. Rayess again on October 14, 2010 and reported anxiety from construction directly outside her apartment.[87]   On November 4, 2010, she

---

[78] A.R. 486.

[79] A.R. 487.

[80] A.R. 484.

[81] A.R. 484.

[82] A.R. 476–78.

[83] A.R. 476.

[84] A.R. 476.

[85] A.R. 478.

[86] A.R. 478.

[87] A.R. 482–83.

"reported feeling much better."[88]   She stated she had more energy and had been painting and reading.[89]   But on December 16, 2010, she reported "low energy and difficulty getting out of the house."[90]   Dr. Rayess decided to keep Ms. Thrasher on the same medications.[91]   Two months later, on February 17, 2011, Ms. Thrasher "reported doing very well" and "denied feeling down or depressed."[92]   She also reported "going to art classes once a week."[93]

On June 2, 2011, Ms. Thrasher again met with Dr. Rayess and reported that she had stopped all her medications two months earlier because she "was getting very nauseous and throwing up because of [the] medications."[94]   She stated she was "feeling down and depressed" and having "difficulty sleeping."   Dr. Rayess prescribed Paxil and Ambien.[95]   The next month, Ms. Thrasher met with Dr. Rayess twice and reported taking Paxil and not feeling depressed.[96]   At the first visit, Dr. Rayess discontinued the Ambien and prescribed Vistaril.[97]   At the second visit, Dr. Rayess added doxepin.[98]

---

[88] A.R. 480.

[89] A.R. 480.

[90] A.R. 479, 505.

[91] A.R. 479, 505.

[92] A.R. 504.

[93] A.R. 504.

[94] A.R. 503.

[95] A.R. 503.

[96] A.R. 501–02.

[97] A.R. 502.

[98] A.R. 501.

On September 29, 2011, Ms. Thrasher complained of feeling tired.[99] However, she also "reported feeling okay in general" and "denied feeling down or depressed." Dr. Rayess's notes state that "[t]he patient's depression appears to be under control." Dr. Rayess discontinued Ms. Thrasher's Vistaril because Ms. Thrasher said she had stopped taking it and prescribed Adderall.[100]

At her next visit with Dr. Rayess, on November 17, 2011, Ms. Thrasher reported she was "doing very well," "having a stable mood," and not feeling "anxious or nervous" or "down or depressed."[101] Dr. Rayess's notes state that "the patient is doing very well currently." He continued Ms. Thrasher on Paxil, doxepin, and Adderall.[102]

On March 1, 2012—Ms. Thrasher's last visit to ACMHS that is documented in the record—Ms. Thrasher told Dr. Rayess she was feeling extremely anxious because "her ex-boyfriend, who beat her and caused a skull fracture, was getting out of prison in about a week or so."[103] She also reported that she had drunk alcohol on a few occasions during the preceding three weeks to calm down.[104]

---

[99] A.R. 500.

[100] A.R. 500.

[101] A.R. 499.

[102] A.R. 499.

[103] A.R. 498.

[104] A.R. 498.

## B. Other Medical Evidence.

In 2009, DDS referred Ms. Thrasher to Michael Rose, Ph.D., for a diagnostic evaluation.[105] Additionally, a psychologist, Arthur Lewy, Ph.D., and a psychiatrist, Wandal Winn, M.D., each reviewed Ms. Thrasher's file for DDS.[106] Dr. Rose's evaluation and Dr. Lewy's and Dr. Winn's reviews were evidently done as part of DDS's review of a prior application or applications by Ms. Thrasher for Social Security benefits.[107]

### i. Diagnostic Evaluation by Dr. Michael Rose (June 16, 2009).

Dr. Rose performed the diagnostic evaluation of Ms. Thrasher on June 16, 2009.[108] Dr. Rose interviewed Ms. Thrasher, administered certain diagnostic tests, and reviewed seven items: one ACMHS record from 2006, four ACMHS records from 2008, and two PAMC records, one each from 2007 and 2008.[109] Dr. Rose assessed a GAF score of 55.[110] He summarized the results of his evaluation in part as follows:

> Determining an accurate diagnosis for Ms. Thrasher is complicated by her confusing history as well as test results indicating she appeared to be exaggerating or magnifying symptoms. . . . There can be little doubt that Ms. Thrasher has significant psychological problems . . . . Ms. Thrasher's ability to understand, retain and follow instructions and sustain attention to perform simple repetitive tasks appears limited but not precluded. . . . Clearly, her psychological problems interfere with her ability to maintain a

---

[105] A.R. 365.

[106] *See* A.R. 375–89, 459–75.

[107] *See* Docket 16 at 14 (Thrasher Br.).

[108] A.R. 365.

[109] *See* 365–66.

[110] A.R. 372. A GAF score of 55 indicates "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." A.R. 496.

normal work schedule, but these problems should (and have previously) positively responded to previous psychiatric, pharmacotherapy and psychotherapeutic interventions.[111]

ii. *Case Reviews by Dr. Arthur Lewy (July 8, 2009) and Dr. Wandal Winn (June 17, 2010).*

Based on his record review, Dr. Winn opined that Ms. Thrasher has the functional capacity to "complete simple repetitive tasks;" "manage basic work-related social interactions with supervisors, coworkers, and [the] public adequately;" and "respond appropriately to 'simple' routine changes in the work setting."[112] He concluded that Ms. Thrasher is able to perform simple unskilled work, including certain of the jobs she had performed in the past.[113] Dr. Lewy's conclusions were similar to Dr. Winn's.[114]

### C. *Non-Medical Evidence.*

In early 2011, Ms. Thrasher and her mother, Janet Borderieux, each submitted function reports to DDS in support of Ms. Thrasher's SSI application.[115] Ms. Borderieux's function report states that Ms. Thrasher is capable of performing daily living activities when not depressed but that "sometimes she doesn't get out of bed for days" due to depression.[116] Ms. Thrasher's function report, dated February 22, 2011 states: "I spend about 7 days in bed depressed, if not I get up and take care of myself

---

[111] A.R. 372–73.

[112] A.R. 475.

[113] A.R. 461.

[114] *See* A.R. 389 (opining Ms. Thrasher has functional capacity to perform simple, repetitive, routine, and predictable tasks; have "occasional public contact and contact with co-workers;" and "accept supervision that is concrete and well-explained").

[115] A.R. 209–16, 232–39.

[116] A.R. 209–16.

and feed my dog, prepare some food for myself and make appointments. I shower at nite if I feel ok, sometimes I don[']t for a week."[117]

## III.    Testimony at the Hearing.

Ms. Thrasher's hearing before the ALJ lasted approximately one hour.[118] Ms. Thrasher, Ms. Thrasher's attorney, Ms. Borderieux, and an independent vocational expert ("VE") were present.[119] At the outset of the hearing, Ms. Thrasher's attorney asked to amend the alleged onset date from January 24, 2008 to January 26, 2008, and the ALJ agreed.[120]

Ms. Thrasher testified that her job at Arc of Anchorage "was the last time that [she] worked for any substantial length of time."[121] At that job, she assisted in the provision of services to developmentally disabled adults.[122] She testified that at some point, a supervisor told her that she had "been sexually abused," and if she did not "deal

---

[117] A.R. 232; *cf. supra* text accompanying note 92 (five days earlier Ms. Thrasher had told Dr. Rayess she was doing well and not feeling depressed). Both function reports also contained many indications of positive functioning. *See* A.R. 15 (ALJ's discussion of function reports).

[118] *See* A.R. 35, 85.

[119] A.R. 35.

[120] A.R. 36–37. January 26, 2008 is the day after ALJ Bauer dismissed Ms. Thrasher's request for a hearing on the denial of her 2006 applications for benefits. *See supra* note 12.

[121] A.R. 40.

[122] A.R. 41–42. Ms. Thrasher's sister worked at Arc of Anchorage and helped Ms. Thrasher get the job. A.R. 42. Ms. Thrasher's brother is developmentally disabled and received services from Arc of Anchorage when Ms. Thrasher worked there as well as at the time of the hearing. A.R. 42–43.

with it," she would "go crazy or kill [herself] someday."[123]   After that, Ms. Thrasher

indicated that she relapsed into alcoholism and was fired.[124]

With respect to her mental health, Ms. Thrasher testified that she has had "a lot

of trouble maintaining like a steady stability."[125]   She testified she was currently taking

Paxil, Lorazepam (Ativan), doxepin, and Adderall.[126]   She testified that she had been

living alone since the February 2010 assault.[127]   When asked if she had any physical

limitations, Ms. Thrasher responded: "Getting myself to do it is - - can be hard; but

physically, no, it's - - I'll get depressed and not do things for weeks."[128]

Ms. Borderieux also testified, primarily about Ms. Thrasher's childhood.[129]   When

asked what she thought of Ms. Thrasher's mental impairments, she testified, "I think

[Ms. Thrasher] kind of got fallen through the cracks."[130]

At the end of the hearing, the ALJ posed hypothetical questions to the VE.   The

VE testified that a hypothetical person of Ms. Thrasher's age, education, and work

experience who has no exertional limitations and is "limited to one- to three-step tasks

---

[123] A.R. 44.

[124] A.R. 44.

[125] A.R. 47; *see also* A.R. 56 ("I feel like I never quite get stable.").

[126] A.R. 47.  *But see* A.R. 56 ("I haven't gotten any, like, significant psychiatric help, like to be - - what am I trying to say?  Like a therapeutic help.").

[127] A.R. 50.

[128] A.R. 51; *see also* A.R. 56 ("And my depression is pretty bad. . . .  I'll go for a week without coming out of the house, and it's been this way most of my life.").

[129] *See* A.R. 65–71.  Ms. Thrasher elected not to be present when Ms. Borderieux testified. A.R. 63–64.

[130] A.R. 68.

involving only simple work-related decisions, and with few, if any, workplace changes"
would be capable of performing Ms. Thrasher's past jobs as sheet folder, counter
attendant at a coffee shop, folding machine feeder, and cashier.[131]   The VE also
testified that this hypothetical individual would be capable of performing other jobs that
exist in the national and regional economies, including dishwasher (kitchen helper and
scullion), cleaner/housekeeping, and silver wrapper.[132]  But if this hypothetical individual
was unable, due to a combination of mental impairments, "to engage in sustained work
activity for a full eight-hour workday on a regular and consistent basis," then that would
preclude any competitive employment in the national economy.[133]

## IV.    The ALJ's Decision and Ms. Thrasher's Appeal.

After considering all the evidence in the record, the ALJ found that Ms. Thrasher
was not under a disability from January 20, 2011 through April 6, 2012, the date of the
ALJ's decision.[134]   On July 10, 2013, the Social Security Appeals Council denied Ms.
Thrasher's request for review.[135]   The ALJ's decision is therefore the final decision of
the Social Security Commissioner.[136]

---

[131] A.R. 78.

[132] A.R. 79.

[133] A.R. 80.

[134] A.R. 19.  The ALJ likely referenced the protective filing date (January 20, 2011) as opposed
to the disability onset date because SSI is not payable "for the month in which [a claimant's]
application is filed or any months before that month."  *See* 20 C.F.R. § 416.335.

[135] A.R. 1.

[136] A.R. 1.

Ms. Thrasher timely filed this appeal on August 22, 2013, seeking judicial review of the ALJ's findings pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).[137] Ms. Thrasher asks the Court to reverse the ALJ's decision and remand for an award of benefits.[138] Defendant Social Security Commissioner opposes the requested relief and asks the Court to enter a judgment affirming the ALJ's decision.[139]

## DISCUSSION

The Social Security Act provides for the payment of SSI to disabled individuals who satisfy certain income and resource eligibility criteria.[140] Disability under the Act is defined as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[141]

The Social Security Commissioner has established a five-step process for determining disability.[142] At Steps 1 through 4, the claimant bears the burden of proving

---

[137] Docket 1 (Compl.).

[138] Docket 1 at 2 (Compl.); *see also* Docket 16 at 24 (Thrasher Br.).

[139] Docket 13 at 3 (Answer); *see also* Docket 17 at 12 (Comm'r Br.).

[140] 42 U.S.C. §§ 1381–1382.

[141] 42 U.S.C. § 1382c(a)(3)(A). This definition of disability for SSI purposes mirrors the definition of disability for DIB purposes. *See* 42 U.S.C. § 423(d)(1)(A). Disability regulations for the SSI and DIB programs also mirror each other. Accordingly, case law dealing with one program is generally relevant to both programs.

[142] 20 C.F.R. § 416.920(a)(4).

her entitlement to disability benefits; at Step 5, the burden shifts to the Social Security Commissioner to show there is gainful activity the claimant can perform.[143]

At Step 1, the claimant must show she is not currently engaged in substantial gainful activity.[144] At Step 2, the claimant must demonstrate that her impairment is "severe," i.e., is an impairment that "significantly limits [her] physical or mental ability to do basic work activities" that has lasted or is expected to last for at least twelve months.[145] At Step 3, if the claimant proves her impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, then the ALJ must conclude the claimant is disabled.[146] If not, then the ALJ determines the claimant's residual functional capacity ("RFC"), which is the most work the claimant can still do despite her limitations.[147] At Step 4, the ALJ uses the RFC to determine whether the claimant is capable of performing her past relevant work.[148] If the claimant proves she cannot perform her past relevant work, then at Step 5, the Social Security Commissioner must show—based on the claimant's RFC, age, education, and work experience—that the claimant is capable of performing other work that exists in the national economy.[149] If the claimant can make an adjustment to

---

[143] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)).

[144] 20 C.F.R. § 416.920(a)(4)(i).

[145] 20 C.F.R. § 416.920(a)(4)(ii), (c); 20 C.F.R. § 416.909.

[146] 20 C.F.R. § 416.920(a)(4)(iii).

[147] 20 C.F.R. § 416.945(a)(1). The ALJ makes the RFC determination based on "all of the relevant medical and other evidence," including "descriptions and observations of [the claimant's] limitations" provided by the claimant and others. *Id.* § 416.945(a)(3).

[148] 20 C.F.R. § 416.920(a)(4)(iv).

[149] 20 C.F.R. § 416.920(a)(4)(v).

such other work, she is not disabled.  If she cannot make such an adjustment, then she is considered disabled.[150]

In this case, at Step 1 the ALJ found that Ms. Thrasher has not engaged in substantial gainful activity since January 20, 2011.[151]  At Step 2, the ALJ found that Ms. Thrasher has the following severe impairments: "anxiety disorder (possible [PTSD]); affective disorder; and polysubstance abuse."   At Step 3, the ALJ found that Ms. Thrasher does not have an impairment or combination of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[152]

The ALJ then determined that Ms. Thrasher has the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work involving one to three step tasks with only simple, work-related decisions and few, if any, workplace changes."[153]  At Step 4, the ALJ relied on the testimony of the VE to determine that Ms. Thrasher is capable of performing her past relevant work as a sheet folder, counter attendant in a coffee shop, folding machine feeder, and cashier.[154]  And, although not required to reach Step 5, the ALJ also determined that Ms. Thrasher is capable of performing other jobs existing in the

---

[150] *Id.*

[151] A.R. 12.

[152] A.R. 12.

[153] A.R. 14.

[154] A.R. 17.

national economy, including dishwasher, cleaner, and silver wrapper.[155]   Accordingly, the ALJ ruled that Ms. Thrasher is not disabled under the Social Security Act.[156]

## I.   Standard of Review.

The ALJ's denial of benefits to Ms. Thrasher should be set aside "only if it is not supported by substantial evidence or is based on legal error."[157]   An ALJ's determination is based on legal error if the ALJ failed to apply the proper legal standard.[158]   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion."[159]   This Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."[160]

## II.   Analysis.

Ms. Thrasher argues four main points in her brief: (1) the record demonstrates she is disabled; (2) she is entitled to disability insurance benefits ("DIB") extending back

---

[155] A.R. 17–18.

[156] A.R. 19.  Because the ALJ concluded Ms. Thrasher is not disabled, he did not conduct a drug addiction and alcoholism ("DAA") analysis.  *See Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001) ("If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is no need to proceed with the analysis under 20 C.F.R. §§ 404.1535 or 416.935.  If the ALJ finds that the claimant is disabled and there is 'medical evidence of [his or her] drug addiction or alcoholism,' then the ALJ should proceed under §§ 404.1535 or 416.935 to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'  20 C.F.R. §§ 404.1535, 416.935." (alterations in original)).

[157] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)).

[158] *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("We will affirm . . . if the ALJ applied the proper legal standard . . . .").

[159] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[160] *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

to March 31, 2005, the date she was last insured; (3) "there is no legitimate RFC"; and (4) the ALJ was biased.[161]  The Court will address these arguments in turn.

### A. Substantial evidence supports the ALJ's determination that Ms. Thrasher has the RFC to engage in certain types of sustained work activity and is not disabled.

Ms. Thrasher's brief identifies certain portions of the record and asserts that the "[e]vidence of disability is overwhelming."[162]  She maintains that she fits the description in the second hypothetical the ALJ posed to the VE "of someone who cannot dependably and reliably show up for work."[163]  In other words, Ms. Thrasher appears to assert that there is not substantial evidence to support the ALJ's determination that Ms. Thrasher has the RFC to engage in certain types of sustained work activity.  However, Ms. Thrasher's selective account of the evidence in the record is inadequate to show a lack of substantial evidence to support the ALJ's determination that Ms. Thrasher's depression and other mental health challenges are not debilitating.

Ms. Thrasher also asserts that in making the RFC determination, the ALJ "erred by according weight to Dr. Rose, Dr. Lewy, and Dr. Winn."[164]  With respect to Dr. Lewy, Ms. Thrasher asserts he "merely did a paper review of Dr. Rose's work," and to the extent his conclusions concur with Dr. Rose's, they are "superfluous, mere

---

[161] Docket 16 at 1–24 (Thrasher Br.).

[162] Docket 16 at 3 (Thrasher Br.).

[163] Docket 16 at 10 (Thrasher Br.).

[164] Docket 16 at 11 (Thrasher Br.).  The ALJ assigned "significant weight" to all three doctors' opinions.  A.R. 16–17.

redundancies."[165]   However, Social Security Ruling 96-6p requires ALJs to consider the

opinions of state agency nonexamining physicians and to "explain the weight given to

these opinions."[166]   It was thus not error for the ALJ to explain that he accorded

"significant weight" to Dr. Lewy's opinion, particularly since it was in accord with Dr.

Rose's opinion and the medical treatment records.

With respect to Dr. Winn, Ms. Thrasher points out that in his review, Dr. Winn

states that Ms. Thrasher was hospitalized in February 2010 for attempting suicide after

"partying," but the PAMC records in fact state that Ms. Thrasher and her friend were

"parting."[167]   It appears Dr. Winn read "parting" in the PAMC records as a typographical

error for "partying."   While Dr. Winn could have been more explicit in this regard, his

reading of the PAMC record is not unreasonable, nor does it call into question the

validity of his ultimate conclusion—relied upon by the ALJ—that Ms. Thrasher has the

functional capacity to perform simple, unskilled work.

With respect to all three doctors, Ms. Thrasher notes that Dr. Rose's evaluation

and Dr. Winn's and Dr. Lewy's case reviews were all done prior to the filing of Ms.

---

[165] Docket 16 at 11 (Thrasher Br.).  Ms. Thrasher also asserts that to the extent Dr. Lewy "arrived at conclusions that differ from [Dr.] Rose's, that is not substantial evidence at all." Docket 16 at 11.  It is true that where physicians' opinions differ, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . an examining physician."  *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995).  However, Ms. Thrasher has not identified any inconsistency between Dr. Lewy's opinion and Dr. Rose's opinion, so the ALJ did not err in according significant weight to both.

[166] *See* SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996); *see also Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996) (courts defer to Social Security Rulings "unless they are plainly erroneous or inconsistent with the Act or regulations").

[167] Docket 16 at 12 (Thrasher Br.) (citing A.R. 407, 472); *see also supra* text accompanying note 68.  The ALJ quoted this portion of Dr. Winn's review.  *See* A.R. 17; *see also infra* Discussion Part II.D.

Thrasher's current SSI application in January 2011.[168] She asserts the ALJ's statements that Dr. Rose's evaluation "is consistent with the record" and that Dr. Winn's and Dr. Lewy's case reviews "were based on a review of the record" are inaccurate because the doctors did not review the entire record for this 2011 SSI claim.[169] However, Dr. Rose's evaluation and Dr. Lewy's and Dr. Winn's reviews took place in 2009 and 2010, after Ms. Thrasher's January 2008 alleged onset date. And the medical records they reviewed are identified and included in the administrative record for this claim.[170] Moreover, the medical records post-dating the doctors' analyses are consistent with their opinions. Ms. Thrasher has not cited, and the Court has not found, any legal authority suggesting it was inappropriate for the ALJ to rely on the opinions of Drs. Rose, Lewy, and Winn under these circumstances.

Ms. Thrasher also asserts the ALJ "was selective as to Borderieux's Third Party Statement, highlighting in his selections only items that portrayed Thrasher in an active, productive light."[171] This observation has merit. And yet, while the ALJ should have presented a more balanced view of the complete content of Ms. Borderieux's function report, his failure to do so does not negate the validity of his RFC determination. Viewing the record as a whole, the Court finds that substantial evidence supports the

---

[168] Docket 16 at 12–13 (Thrasher Br.).

[169] Docket 16 at 12–13 (Thrasher Br.); *see also* A.R. 16–17.

[170] *See* A.R. 365–66 (listing records reviewed by Dr. Rose), 385 (discussing records reviewed by Dr. Lewy), 459 (listing reviewed by Dr. Winn).

[171] Docket 16 at 9 (Thrasher Br.). The ALJ accorded "some weight" to Ms. Borderieux's function report. A.R. 15; *cf.* 20 C.F.R. § 416.929(c)(3) (in determining limiting effect of symptoms, ALJ considers observations made by third parties).

ALJ's conclusion that Ms. Thrasher is capable of engaging in certain sustained work activity.

### B. Ms. Thrasher is not entitled to benefits based on her 2006 applications.

Next, Ms. Thrasher asserts that "in the course of adjudicating this 2011 SSI claim, ALJ Hebda resorted to [evidence from] prior closed claims."[172]  She asserts the ALJ's action in this regard "amounted to *de facto* reopening of all the other claims within the meaning of *Lewis v. Apfel*."  Thus, Ms. Thrasher asserts she is entitled to benefits based on her 2006 applications for DIB and SSI.[173]

In *Lewis*, the claimant, Lewis, first applied for social security benefits in 1991.[174] This application was denied without a hearing.  Lewis next applied for benefits in 1992, alleging he had been unable to work since September 1990.  This application was denied, and Lewis requested a hearing before an ALJ.[175]  At the hearing, Lewis moved to change the alleged onset date to March 1987, but the ALJ denied the motion.[176]  The ALJ found that Lewis had not been under a disability since September 1990.[177]  Lewis sought judicial review of the ALJ's findings.  A magistrate judge affirmed, and in the process "concluded sua sponte that the 1991 application had res judicata effect on the

---

[172] Docket 16 at 13 (Thrasher Br.).

[173] Docket 16 at 15 (Thrasher Br.); *see also supra* note 12.  This issue could well be considered moot in light of the Court's determination that substantial evidence supports the ALJ's finding of no disability after the January 2008 onset date for this application.

[174] *Lewis v. Apfel*, 236 F.3d 503, 508 (9th Cir. 2001).

[175] *Id.*

[176] *Id.* at 509.

[177] *Id.* at 508.

issue of disability through June 1991."[178]  On appeal to the Ninth Circuit, Lewis argued "that the appropriate starting point for assessing his disability was March 1987—not July 1991, as the magistrate judge concluded, or September 15, 1990, as the ALJ concluded."[179]

The Ninth Circuit held that "the magistrate judge erred in holding that res judicata barred evidence of disability before June 1991."[180]  The court explained:

> Res judicata does not apply when an ALJ later considers "on the merits" whether the claimant was disabled during an already-adjudicated period. When an ALJ de facto reopens the prior adjudication in that manner, the Commissioner's decision as to the prior period is subject to judicial review. The ALJ knew of the June 1991 denial of Lewis's 1991 application. Yet he considered evidence of disability from as early as 1989, and he accepted without comment the alleged onset date of September 15, 1990. Under these circumstances it is appropriate for the Court to treat the ALJ's actions as a de facto reopening, and assume a disability onset date of September 1990, as the ALJ did.[181]

However, the Ninth Circuit also held that "[t]he ALJ did not err in denying Lewis's requests to amend the alleged onset date" to March 1987.[182]

Here, Ms. Thrasher alleged a disability onset date of January 24, 2008 in her SSI application, which was amended to January 26, 2008 at the hearing at the request of Ms. Thrasher's attorney.[183]  Unlike *Lewis*, the ALJ was not requested to reopen the

---

[178] *Id.*

[179] *Id.* at 509.

[180] *Id.* at 510.

[181] *Id.* (citations omitted).

[182] *Id.*

[183] *See supra* text accompanying notes 12, 120.  It does not appear Ms. Thrasher ever alleged an earlier onset date before the agency.

period prior to January 2008, and he did not do so.[184]  *Lewis* does not support Ms.

Thrasher's assertion that this Court should award Ms. Thrasher benefits based on her

2006 applications.[185]

### C. The ALJ followed the correct regulatory procedure for determining whether Ms. Thrasher's mental impairments are severe.

Next, Ms. Thrasher asserts that the ALJ did not conduct a legitimate RFC

analysis because he did not "assess[] Thrasher's mental impairments in the 2011/12

claim."[186]  She asserts the ALJ's decision "reflects the same error that led to reversal

and remand in *Keyser v. Comm'r SSA*."[187]

In *Keyser*, the Ninth Circuit addressed how an ALJ should conduct Steps 2 and 3

of the disability analysis when a claimant alleges a mental impairment; the court did not,

as Ms. Thrasher suggests, address the ALJ's RFC assessment.  In *Keyser*, the ALJ

determined that the claimant's bipolar disorder was not a severe impairment by relying

---

[184] Some evidence prior to January 2008 is in the record.  *See, e.g.*, A.R. 280–307 (2006–2007 ACMHS Medical Progress Notes).

[185] Ms. Thrasher also asserts "'good cause' reopening within two years obtains here."  Docket 16 at 16 (Thrasher Br.) (citing 20 C.F.R. § 416.1488(b)).  20 C.F.R. § 416.1488(b) provides that the SSA may reopen a determination on an SSI application "[w]ithin two years of the date of the notice of the initial determination if we find good cause as defined in § 416.1489 to reopen the case."  20 C.F.R. § 416.1489(a) provides: "We will find that there is good cause . . . if (1) New and material evidence is furnished; (2) A clerical error was made; or (3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made."  These regulations give the SSA, not a reviewing court, authority to reopen an SSI application determination.  And even if the regulations did give a reviewing court such authority, it has been more than two years since the notice of the initial determination on Ms. Thrasher's 2006 application, and good cause for reopening does not exist.

[186] Docket 16 at 19 (Thrasher Br.).

[187] Docket 16 at 19 (Thrasher Br.).

on a form completed by a state agency reviewing physician.[188]  The Ninth Circuit held

the ALJ erred "by failing to follow the procedures pr[e]scribed in 20 C.F.R. § 404.1520a

for determining whether [a claimant] has a severe mental impairment."[189]  The Ninth

Circuit explained:

> That regulation requires those reviewing an application for disability to
> follow a special psychiatric review technique.  Specifically, the reviewer
> must determine whether an applicant has a medically determinable mental
> impairment, rate the degree of functional limitation for four functional
> areas, determine the severity of the mental impairment (in part based on
> the degree of functional limitation), and then, if the impairment is severe,
> proceed to step three of the disability analysis to determine if the
> impairment meets or equals a specific listed mental disorder.[190]

The ALJ "must 'document application of the technique in the decision.'"[191]

Here, at Step 2, the ALJ determined that Ms. Thrasher has the following severe

impairments: anxiety disorder (possible PTSD), affective disorder, and polysubstance

disorder.[192]  Then, at Step 3, the ALJ rated Ms. Thrasher's degree of functional

limitation in the four functional areas set forth in the regulation described in *Keyser*:

activities of daily living; social functioning, concentration, persistence, or pace; and

episodes of decompensation.[193]  The ALJ determined that Ms. Thrasher has mild

limitations in daily living and social functioning and moderate difficulties with

---

[188] *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 723–24 (9th Cir. 2011).

[189] *Id.* at 725.  20 C.F.R. § 404.1520a is a DIB regulation.  The corresponding SSI regulation is 20 C.F.R. § 416.920a.

[190] *Keyser*, 648 F.3d at 725 (citations omitted).

[191] *Id.* (quoting 20 C.F.R. § 404.1520a(e)(4)).

[192] A.R. 21.

[193] *See* A.R. 12–13; *see also* 20 C.F.R. § 416.920a(c)(3).

concentration, persistence, or pace.[194] The ALJ also found that "no episodes of extended decompensation appear in the record after the claimant's alleged onset date."[195] Based on this analysis, the ALJ concluded that although Ms. Thrasher's mental impairments are severe under Step 2, they do not meet the criteria for a listed impairment under Step 3.[196] Accordingly, Ms. Thrasher is incorrect that none of the analysis required by *Keyser* was done in this case. The ALJ followed the correct regulatory procedures.

### D. Ms. Thrasher has not met her burden of proving bias.

Finally, Ms. Thrasher asserts she "was denied due process by reason of bias in adjudication and lack of impartiality on the part of ALJ Hebda."[197] To establish bias, a claimant must "show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"[198]

---

[194] A.R. 13.

[195] A.R. 13.

[196] A.R. 12–13. SSI regulations provide: "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your [mental] impairment(s) is not severe . . . ." 20 C.F.R. § 416.920a(d)(1). The regulations further provide that in order for a mental impairment to be considered a listed impairment, the claimant must have at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00. Consistent with these regulations, the ALJ concluded Ms. Thrasher's mental impairments were severe but not listed. He then proceeded to determine Ms. Thrasher's RFC. *See* A.R. 14; *see also supra* text accompanying notes 146–47 (if claimant's impairment is listed, then claimant is disabled, but if claimant's impairment is not listed, ALJ must determine claimant's RFC).

[197] Docket 16 at 22 (Thrasher Br.).

[198] *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

To support her argument that the ALJ was biased, Ms. Thrasher points out that ALJ Hebda placed the word "partying" in quotes when discussing Dr. Winn's case review.[199]  However, as explained above, Dr. Winn's reading of the PAMC record was not unreasonable, and the ALJ was entitled to rely on Dr. Winn's opinion.

Ms. Thrasher also asserts that "[n]o clear and convincing reasons were cited to discount the credibility of Thrasher."[200]  But contrary to Ms. Thrasher's assertion, the ALJ in fact provided several clear and convincing reasons for rejecting Ms. Thrasher's testimony as to the severity of her symptoms.  He quoted extensively from the psychiatric treatment records to support his conclusion that Ms. Thrasher's symptoms "are fairly well controlled with medication."[201]

Finally, Ms. Thrasher asserts "[t]he agency failed to legitimately discount the contributions of treating or examining doctors."[202]  However, the ALJ did not discount Ms. Thrasher's treatment records but rather relied on them in conducting his RFC assessment.[203]

Accordingly, the Court finds that Ms. Thrasher has not met her burden of showing the ALJ was clearly unable to render fair judgment of Ms. Thrasher's claim.  To the contrary, the ALJ weighed the evidence in the record and appropriately arrived at

---

[199] Docket 16 at 23 (Thrasher Br.); *see also supra* note 167 and accompanying text.

[200] Docket 16 at 23 (Thrasher Br.); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ must give "specific, clear and convincing reasons" before discrediting claimant's symptom testimony if there is objective medical evidence of impairment that could produce alleged symptoms and no affirmative evidence of malingering).

[201] A.R. 14–15.

[202] Docket 16 at 24 (Thrasher Br.).

[203] *See* A.R. 14–15.

the conclusion that Ms. Thrasher is not disabled within the meaning of the Social Security Act.

## CONCLUSION

The Commissioner's decision AFFIRMED because it is supported by substantial evidence and free from legal error. The Clerk of Court is directed to enter judgment accordingly.

It is further ordered that the Motion to Strike at Docket 22 is GRANTED.

DATED this 12th day of August, 2014, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE